NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2017 VT 92

No. 2016-276

| | |
|---|---|
| Grant Taylor and Richard Scheiber | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Washington Unit, |
| | Civil Division |
| | |
| Town of Cabot, The Cabot Community Association, Inc., and United Church of Cabot, Inc. | March Term, 2017 |

Timothy B. Tomasi, J.

Robert A. Gensburg and Hanne A.A. Trudeau, St. Johnsbury, for Plaintiffs-Appellees.

Daniel P. Richardson and Stephen F. Coteus of Tarrant, Gillies & Richardson, Montpelier, for
  Defendant-Appellant Town of Cabot.

PRESENT: Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.

¶ 1. **ROBINSON, J.** This case involves a challenge under the Compelled Support Clause of the Vermont Constitution to the Town of Cabot's grant of federally derived but municipally managed funds for the purpose of repairs to a historic church. On interlocutory appeal, we consider whether plaintiffs have standing to pursue their claims and whether the trial court erred in issuing a preliminary injunction prohibiting the Town from paying the grant funds pending further order of the court. We conclude that plaintiffs do have municipal taxpayer standing, but vacate the trial court's award of a preliminary injunction and remand for further proceedings to resolve the case on the merits.

¶ 2.    Relying on Chapter I, Article Three of the Vermont Constitution, plaintiffs challenged the Town of Cabot's award of a grant to fund repairs to the United Church of Cabot, and sought a preliminary injunction enjoining the grant.  Defendants moved to dismiss the case on the ground that plaintiffs lacked standing.  At the hearing on the motion for preliminary injunction, the parties did not present testimony, but each offered documentary exhibits and stipulated to a number of facts.  On this record, the trial court made the following findings.

¶ 3.    In the late 1980s, the U.S. Department of Housing and Urban Development (HUD) issued the Town a two-million-dollar Urban Development Action Grant (UDAG) to fund a loan to the Cabot Farmers' Cooperative Creamery so it could construct a warehouse.  By 2003, the Cooperative had paid the loan back to the Town.  Pursuant to its agreement with HUD, the Town was allowed to keep the funds for uses consistent with the applicable HUD regulations and the federal Housing and Community Development Act of 1974.  The Town has kept the funds isolated from other municipal funds in what it now calls the Community Investment Fund of Cabot (CIFC fund).

¶ 4.    The CIFC fund gives grants and loans to local individuals or groups to promote its goals, including to "[p]rotect and enhance the quality of life and character of the town" and to "[i]mprove community infrastructure, facilities and services."  Groups eligible to apply for the grants include "community groups, non-profits, civic organizations, [and] fraternal organizations" as well as entities created by the Town, such as the Cabot Historical Society and the Cemetery Commission.  In order to get a grant from the CIFC fund, the individual or group must submit an application to a committee appointed by the selectboard. The committee then reviews the application and decides whether the intended use of the grant is consistent with the goals of the CIFC fund.  If an application is approved by the selectboard, it is put to a vote on Town Meeting Day and the voters decide if the proposed project is a worthwhile use of CIFC funds.

2

¶ 5.    The United Church of Cabot (UCC) is a place of worship. It also makes its premises available for many nonsectarian community events and gatherings, and is an important and historic building in the town. In 2014, a consultant prepared a "Conditions Assessment," which revealed that the building was in need of repair. The UCC spent significantly on those repairs, but needed more funds and accordingly applied for a $10,000 CIFC grant. The $10,000 amounted to a small portion of the total funds needed to repair the church. The reviewing committee approved the request and the matter was put to a vote on Town Meeting Day in 2016. The warned question was: "Shall the voters of the Town of Cabot approve the sum of ten thousand dollars ($10,000) from UDAG funds in 2016 for the Cabot Community Association (CCA) for the purpose of repairing the steeple, stairwell and other interior sections in urgent need of repair at the United Church of Cabot."[1] The voters approved the grant.

¶ 6.    With respect to the Town's motion to dismiss, the trial court concluded that plaintiffs did have standing on two independent bases. First, the court concluded that plaintiffs had standing as municipal taxpayers. The court rejected the argument that municipal taxpayer standing does not apply because the funds at issue originated from federal coffers. It explained that the funds cannot reasonably be characterized now as anything other than public, municipal funds, and that the funds are intended to be distributed, in part, to projects that might otherwise be funded from local tax revenues, such that there is no meaningful way to divorce the CIFC funds from effects on municipal taxation. Alternatively, the court concluded that plaintiffs had taxpayer standing because their claim was akin to a claim under the Establishment Clause of the First Amendment to the United States Constitution. The court reasoned that a violation of the Compelled Support Clause of the Vermont Constitution is analogous to an Establishment Clause

---

[1] The Town stipulated at the hearing that the CCA's only role in this funding scheme is to receive the grant funds from the Town and deliver them to the UCC and that its function as such has no effect on the issues in this case.

violation. Just as federal taxpayers have standing to pursue certain Establishment Clause claims, as recognized in Flast v. Cohen, 392 U.S. 83, 85 (1968), state taxpayers have standing to advance Compelled Support claims under the Vermont Constitution.

¶ 7. The trial court awarded the preliminary injunction sought by plaintiffs after considering their likelihood of success, whether they would suffer irreparable injury in the absence of a preliminary injunction, and the potential for injury to the public interest or third parties. The court concluded that the first factor weighed in favor of an injunction primarily on account of the breadth of the Town Meeting Day warning concerning the vote. The warning authorized a grant "for the purpose of repairing the steeple, stairwell and other interior sections," without any express restrictions against using the monies to repair religious areas such as the pulpit or altar. The court reasoned that without such restrictions, the grant was analogous to the unrestricted funding for a religious school that this Court struck down in Chittenden Town School District v. Department of Education, 169 Vt. 310, 738 A.2d 539 (1999). With respect to irreparable harm, the court concluded that even if the grantee could be required to repay the grant funds to the Town if plaintiffs prevailed in this case, plaintiffs will have suffered an irreparable affront to their values arising from the unconstitutional use of government dollars by the UCC during pendency of the action. And the court concluded that injunctions protecting freedoms guaranteed by the Declaration of Rights protect the public interest generally, in addition to plaintiffs' own interests.

¶ 8. The trial court granted interlocutory appeal of its ruling. The Town challenges both the trial court's analysis of standing, and its award of a preliminary injunction. In particular, the Town argues that plaintiffs do not have municipal taxpayer standing because the funds at issue derived from a federal grant, and have been held separate from the municipal budget and municipal operating funds. It further argues that Flast is limited to cases in which taxpayers can show a nexus between their status as taxpayers and the constitutional violation, which is absent here. With respect to the preliminary injunction, the Town argues that the trial court misapprehended the

4

merits for a host of reasons, including that the court failed to adequately account for the legal restrictions on the use of the grant funds in concluding that the grant ran afoul of the compelled support clause. It also challenges the trial court's conclusion that an award of the grant would cause the plaintiffs irreparable harm, even if it is subject to repayment if plaintiffs prevail. We consider each argument in turn.

## I. Standing

¶ 9. We conclude that plaintiffs have standing to prosecute their claims. Municipal taxpayer standing under our law encompasses claims that municipal assets have been improperly wasted, and the record in this case supports the conclusion that the grant funds here are municipal assets notwithstanding the fact that the funds originated from the U.S. Treasury.[2] Whether a plaintiff has standing is a legal question, which we review with no deference to the trial court. Baird v. City of Burlington, 2016 VT 6, ¶ 11, 201 Vt. 112, 136 A.3d 223.

¶ 10. We have held that the basis of municipal taxpayer standing "is not that any direct loss has been caused to the plaintiff, but that municipal assets have been improperly wasted." Cent. Vt. Pub. Serv. Corp. v. Town of Springfield, 135 Vt. 436, 438, 379 A.2d 677, 679 (1977); see also Baird, 2016 VT 6, ¶ 21 ("Although taxpayer suits in Vermont are generally 'recognized as appropriate vehicles for seeking relief from official action,' to have standing a plaintiff must still demonstrate that she has either sustained some 'direct loss' or that municipal assets have been 'improperly wasted.' " (quoting Cent. Vt. Pub. Serv. Corp., 135 Vt. at 438, 379 A.2d at 679)).

¶ 11. Our law in this regard is consistent with the U.S. Supreme Court's understanding of municipal standing. Contrasting a claim of federal taxpayer standing with its municipal analog, the Supreme Court referenced "the rule, frequently stated by this court, that resident taxpayers may

---

[2] Because we conclude that plaintiffs have standing as municipal taxpayers, we need not consider their alternate argument that they have standing pursuant to a Vermont analog to federal taxpayer standing in Establishment Clause cases as described in Flast.

sue to enjoin an illegal use of the moneys of a municipal corporation." Massachusetts v. Mellon, 262 U.S. 447, 486 (1923). The Court further explained:

> The interest of a taxpayer of a municipality in the application of its moneys is direct and immediate and the remedy by injunction to prevent their misuse is not inappropriate. It is upheld by a large number of state cases and is the rule of this court. Nevertheless, there are decisions to the contrary. The reasons which support the extension of the equitable remedy to a single taxpayer in such cases are based upon the peculiar relation of the corporate taxpayer to the corporation, which is not without some resemblance to that subsisting between stockholder and private corporation . . . But the relation of . . . taxpayer[s] of the United States to the federal government is very different. [Their] interest in the moneys of the treasury—partly realized from taxation and partly from other sources—is shared with millions of others, is comparatively minute and indeterminable, and the effect upon future taxation, of any payment out of the funds, so remote, fluctuating and uncertain, that no basis is afforded for an appeal to the preventive powers of a court of equity.

Id. at 486-87 (citations omitted).

¶ 12.   Notwithstanding the federal origin of the monies at issue here, we conclude that plaintiff can assert municipal taxpayer standing to challenge the Town's use of the funds. We base this conclusion on the language of the HUD authorization, the extensive control the Town has over the funds, the absence of meaningful federal oversight of the Town's use of the funds, and the fact that the funds would otherwise be available for potential municipal expenditures.

¶ 13.   The Town's 1992 close-out agreement with HUD in connection with the underlying federal grant recognizes that the funds are possessed and controlled by the Town, and authorizes the Town to use them for a broad array of purposes, with virtually no oversight. The agreement provides that UDAG loan repayments to the Town, as well as other payments and income associated with this grant, "shall be considered to be miscellaneous revenues" and "shall be made available by the [Town] for eligible Title I activities pursuant to the Housing and Community and Development Act of 1974."

6

¶ 14. The scope of permissible expenditures pursuant to Title I is quite broad, encompassing the following:

(1) the elimination of slums and blight and the prevention of blighting influences and the deterioration of property and neighborhood and community facilities of importance to the welfare of the community, principally persons of low and moderate income;

(2) the elimination of conditions which are detrimental to health, safety, and public welfare, through code enforcement, demolition, interim rehabilitation assistance, and related activities;

(3) the conservation and expansion of the Nation's housing stock in order to provide a decent home and a suitable living environment for all persons, but principally those of low and moderate income;

(4) the expansion and improvement of the quantity and quality of community services, principally for persons of low and moderate income, which are essential for sound community development and for the development of viable urban communities;

(5) a more rational utilization of land and other natural resources and the better arrangement of residential, commercial, industrial, recreational, and other needed activity centers;

(6) the reduction of the isolation of income groups within communities and geographical areas and the promotion of an increase in the diversity and vitality of neighborhoods through the spatial deconcentration of housing opportunities for persons of lower income and the revitalization of deteriorating or deteriorated neighborhoods;

(7) the restoration and preservation of properties of special value for historic, architectural, or esthetic reasons;

(8) the alleviation of physical and economic distress through the stimulation of private investment and community revitalization in areas with population outmigration or a stagnating or declining tax base; and

(9) the conservation of the Nation's scarce energy resources, improvement of energy efficiency, and the provision of alternative and renewable energy sources of supply.

42 U.S.C. § 5301(c). The authorized uses of the funds that HUD authorized the Town to keep are so expansive that most expenditures within the Town's proper spending authority are likely authorized. As a consequence, the federal restrictions on the Town's use of the money do not undermine the conclusion that the funds constitute municipal assets.

¶ 15. Moreover, the Town's reporting obligation to HUD was time-limited and expired long ago. The Town is required to account to HUD for a period of five years after issuance of a certificate of completion, and has no reporting requirements thereafter. In this case, the certificate of completion is dated April 1992. This means that for nearly twenty years, the Town has held part or all of the former federal grant funds with no requirement for accounting to HUD regarding the Town's use of the funds, and subject only to the limitation that the Town use the funds for purposes falling within the broad range authorized by Title I.

¶ 16. Finally, we agree with the trial court's inference that the grant program set up by the Town contemplates the possibility of grants for a host of purposes that may supplant municipal general fund expenditures such that the CIFC funds cannot be meaningfully divorced from their effects on municipal taxation. The CIFC program guidelines expressly contemplate the potential allocation of grant funds to municipal governmental agencies for capital projects, and to committees, agencies, organizations, or commissions created by the Town, the Village of Cabot, or the Cabot School District, and identify the Recreation Committee, the Conservation Committee, and the Cemetery Commission as examples of potential grantees. An award of CIFC funds to the UCC may displace a grant to a tax-funded entity, with the potential consequence of affecting taxes.

¶ 17. Under these circumstances, the fact that the funds originated from the federal treasury does not undermine the conclusion that they are municipal assets for the purpose of municipal taxpayer standing. See Cent. Vt. Pub. Serv. Corp., 135 Vt. at 442, 379 A.2d at 691 ("A taxpayer's action is an appropriate vehicle for testing the legality of municipal expenditures from federal revenue sharing funds."); Mathews v. Massell, 356 F. Supp. 291, 298 (N.D. Ga. 1973)

8

(holding that where federal law imposed penalty and repayment obligation for misuse of federal revenue-sharing funds by municipality, municipal taxpayer alleged sufficient injury to assert municipal taxpayer standing to challenge the proposed use).

## II. Preliminary Injunction

¶ 18. We affirm the preliminary injunction standard applied by the trial court, but conclude that the trial court erred in awarding the preliminary injunction because it overestimated the plaintiffs' likelihood of success on the merits, and erred in concluding that plaintiffs would suffer irreparable injury in the absence of an injunction.

¶ 19. "A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). In each instance, we "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Id. The movant bears the burden of establishing that the relevant factors call for imposition of a preliminary injunction. Id. at 20. The trial court here rightly identified the main factors guiding its review under Vermont law: (1) the threat of irreparable harm to the movant; (2) the potential harm to the other parties; (3) the likelihood of success on the merits; and (4) the public interest.[3] In re J.G., 160 Vt. 250, 255 n.2, 627 A.2d 362, 365 n.2 (1993).

---

[3] In its entry regarding the Town's motion for permission to take interlocutory appeal, the trial court noted that other courts have adopted slight variations to these factors. The trial court cited a recent federal district court decision from New York in which the court expanded the "likelihood of success on the merits" factor to encompass "sufficiently serious questions as to the merits plus a balance of hardships that tips decidedly in their favor." General Mills, Inc. v. Chobani, LLC, 158 F. Supp. 3d 106, 115 (N.D.N.Y. 2016). We conclude that our formulation is functionally difficult to distinguish from the alternatives identified in the General Mills case. Insofar as our test calls for a balancing of multiple factors, including the likelihood of success on the merits, it is sufficiently flexible to allow for a preliminary injunction in cases in which the court cannot definitively conclude that the movant is likely to prevail on the merits, but the balance of other factors tips strongly in favor of an injunction. Accordingly, we maintain the formulation we adopted in In re J.G., 160 Vt. at 255 n.2, 627 A.2d at 365 n.2.

¶ 20. While this Court has not explicitly adopted any standard of review for preliminary injunctions, federal courts review the award of injunctive relief for abuse of discretion. Ashcroft v. Am. Civil Liberties Union, 542 U.S. 656, 664 (2004). To the extent that the trial court's analysis relies on factual determinations, we review those determinations deferentially. Baird, 2016 VT 6, ¶ 12. Our review of the trial court's legal analysis is non-deferential. Id.

A. Likelihood of Success on the Merits

¶ 21. Applying these standards, we first conclude that the trial court overstated the extent to which plaintiffs established a likelihood of success on the merits. Our analysis is framed by the Compelled Support Clause of Chapter I, Article Three of the Vermont Constitution and our caselaw thereunder, limitations arising from the Free Exercise Clause of the First Amendment to the U.S. Constitution, and the record in this case. In light of these considerations, plaintiffs' path to success on the merits is narrow. Plaintiffs face strong headwinds in arguing that the Compelled Support Clause embodies a categorical prohibition against any public funding for physical repairs to a place of worship, and plaintiffs have not yet presented sufficient evidence to demonstrate a high likelihood of success on a narrower claim.

¶ 22. The Vermont Constitution protects against compelled support for religion. In particular, Chapter I, Article Three provides that "no person ought to, or of right can be compelled to attend any religious worship, or erect or support any place of worship, or maintain any minister, contrary to the dictates of conscience." Although Article Three promotes the same general goals as the First Amendment to the U.S. Constitution, this Court has recognized that the two provisions are textually distinct, and may lead to divergent outcomes in some cases. Chittenden Town Sch. Dist., 169 Vt. at 323, 738 A.2d at 549.

¶ 23. The focus of the Compelled Support Clause is the support for "worship" itself. This Court considered the Compelled Support Clause in depth in Chittenden Town School District. In that case, we considered whether a scheme that reimbursed tuition for sectarian schools from

10

public monies ran afoul of the Compelled Support Clause. We explained that, "although the words might appear to be broader, . . . Article 3 is not offended by mere compelled support for a place of worship unless the compelled support is for the 'worship' itself." Id. at 325, 738 A.2d at 550. The Court concluded on the record before it that religious instruction could not be separated from religious worship, and that the tuition payment system in question, with no restrictions on funding religious education, accordingly violated Article Three. Id. at 342-43, 738 A.2d at 562. The Court emphasized that the major deficiency in the tuition-payment system was the lack of restrictions that prevented the use of public money to fund religious education, and that it was not ruling more generally that children who attend religious schools may not receive public educational funding. Id. at 343-44, 738 A.2d at 562-63. The Court noted that its narrow ruling avoided offense to the Free Exercise Clause of the First Amendment to the United States Constitution. Id. at 344, 738 A.2d at 563. For the purposes of this case, the most critical lesson from Chittenden Town School District is that the fact that the recipient of government support is a religious organization is not itself determinative under the Compelled Support Clause; whether the funds are used to support religious worship is the critical question. Id. at 325, 738 A.2d at 550.

¶ 24.    The Free Exercise Clause is a second critical touchstone impacting plaintiffs' likelihood of success on the merits. While public support to religious organizations potentially implicates the Compelled Support Clause of the Vermont Constitution, a refusal to afford religious organizations access to secular benefits generally available to like institutions on account of their religious affiliations may also trigger concerns under the Free Exercise Clause.

¶ 25.    The U.S. Supreme Court recently reaffirmed this very point in Trinity Lutheran Church of Columbia, Inc. v. Comer—a case that post-dates the trial court's decision in this case. 137 S. Ct. 2012 (2017). In that case, the Supreme Court considered a state-run program that provides grants to qualifying nonprofit organizations to install playground surfaces made from recycled tires. Trinity Lutheran Church sought a grant to replace a large portion of the playground

that served its preschool and daycare center. The program had a strict and express policy of denying grants to any applicant owned or controlled by a church, sect or other religious entity, and it rejected Trinity Lutheran's grant request on that basis. The program exclusion was grounded in a provision of the Missouri Constitution prohibiting the use of public monies, "directly or indirectly, in aid of any church, sect or denomination of religion." Mo. Const. art. I, § 7. The Court concluded that the exclusion of religious organizations from the benefits program required strict scrutiny under the Free Exercise Clause because it disqualified Trinity Lutheran from a public benefit solely because of its religious character. Trinity Lutheran, 137 S. Ct. at 2021. The Court explained, "[t]he express discrimination against religious exercise here is not the denial of a grant, but rather the refusal to allow the Church—solely because it is a church—to compete with secular organizations for a grant." Id. at 2022. In doing so, the State essentially put Trinity Lutheran "to a choice: [i]t may participate in an otherwise available benefit program or remain a religious institution." Id. at 2021-22.

¶ 26. The Court in Trinity Lutheran differentiated the program for funding playground resurfacing from scenarios in which state funds are used to fund religious activity, distinguishing a prior decision in which the Court upheld the exclusion from a state-funded scholarship program for post-secondary education of funding for a devotional theology degree. Id. at 2022-25 (distinguishing Locke v. Davey, 540 U.S. 712 (2004)). In Locke, a state program provided scholarships to high-achieving students to pursue postsecondary education. Scholarship recipients were free to use the money at accredited religious and non-religious schools, but were not permitted to use the funds to pursue a degree that was "devotional in nature or designed to induce religious faith." 540 U.S. at 716 (quotation omitted). A recipient was selected for a scholarship, but was denied funds when he refused to certify that he would not use them toward a devotional degree. The Supreme Court concluded that the state's denial did not run afoul of the Free Exercise Clause. Id. at 725. In Trinity Lutheran, the Supreme Court explained that in Locke, the State had

12

not denied the scholarship because of who the recipient <u>was</u>, but, rather because of what he proposed <u>to do</u>—use the funds to prepare for the ministry. The scholarship program did not "require students to choose between their religious beliefs and receiving a government benefit." <u>Trinity Lutheran</u>, 137 S. Ct. at 2023 (quotation omitted). Moreover, the Court "could 'think of few areas in which a State's antiestablishment interests come more into play' " than with respect to using taxpayer funds to pay for the training of clergy. <u>Id</u>. (quoting <u>Locke</u>, 540 U.S. at 722). The Court concluded, "nothing of the sort can be said about a program to use recycled tires to resurface playgrounds." <u>Id</u>.

¶ 27.    Applying strict scrutiny, the Court concluded that Missouri's interest in "skating as far as possible from religious establishment concerns" was insufficient to support the clear infringement on Trinity Lutheran's free exercise rights. <u>Id</u>. at 2024. The Court expressly noted, "the state interest asserted here—in achieving greater separation of church and State than is already ensured under the Establishment Clause of the Federal Constitution—is limited by the Free Exercise Clause." <u>Id</u>.

¶ 28.    The third foundation for our analysis—the record in this case—is not fully developed with respect to the anticipated and permitted use of the grant funds. The grant funds in this case were undisputedly allocated for the purpose of maintenance and repairs to a building that serves as a place of worship, is available for many nonsectarian community events and gatherings, and is an important and historic building in the town. The $10,000 grant amounts to a small portion of the total funds needed to repair the church. The warned question approved by the voters of the Town authorizes funding "for the purpose of repairing the steeple, stairwell and other interior sections in urgent need of repair at the United Church of Cabot."

¶ 29.    Although the parties relied on this warning as descriptive of the scope of the grant for the purpose of the preliminary injunction hearing, other uncontested documents in the record appear to significantly limit the scope of the grant. UCC's grant application describes a 2014

13

"Conditions Assessment" that enumerates and prioritizes the needed repairs to the UCC church building. Noting the significant work that had been completed already, the narrative explains that three exterior sides of the church need further painting, and that because some sill damage was discovered in one corner of the building when rotten clapboards were being replaced, other sills need to be assessed by removal of other sheathing material. Accordingly, the grant application seeks funding for two particular remaining projects:

> Painting remaining block of the church: $18,000
> Sill exposure and examination: $960
> Total: $18,960

In the application, the UCC pledges to fund $8960 from its own resources, and seeks a $10,000 grant for the balance. Pursuant to the rules that apparently govern the program,[4] grants may be used only for the purposes specified in the grant proposal as submitted by the Committee to the voters prior to the vote, and the Committee may withhold payment of granted funds if the project deviates significantly from its application and description. These apparent limitations on the use of the grant funds narrow the question in this case considerably: the question is not whether a grant from the Town for the broad purpose of repairs to the structure, including "interior sections," offends the Compelled Support Clause; it is whether a grant for the purpose of paying a portion of the cost for painting three exterior sides of the church building and examining window sills for structural damage runs afoul of the Clause.[5]

---

[4] At the hearing, the parties offered various exhibits that were admitted by agreement. There was no additional testimony establishing the context of the various exhibits.

[5] The Town argues on appeal that the scope of the grant is also limited by federal statutory and regulatory restrictions governing the use of Title I funds and prohibiting their application to improvements to "sanctuaries, chapels, and other rooms" that a congregation uses as its principal place of worship. 24 C.F.R. § 570.200(j)(5). The applicability of these regulations to the grant at issue is questionable given that the close-out agreement from the federal grant specifically states that the funds are not subject to the implementing regulations in which the above provision appears. Even if this regulation does limit the Town's authority to distribute the funds, there is nothing in the record reflecting that this restriction has been incorporated as a term of the grant or that this

14

¶ 30. Given these considerations, plaintiffs' path to success on the merits is narrow and challenging. The fact that the ultimate recipient of these funds is a church does not itself establish a violation of the Compelled Support Clause; the critical question is whether the funds will support worship. Chittenden Town Sch. Dist., 169 Vt. at 325, 738 A.2d at 550. In fact, denying the UCC secular benefits available to other like organizations might raise concerns under the Free Exercise Clause of the United States Constitution. To meet these concerns, plaintiffs will have to demonstrate that painting the church building and assessing its sills is more like funding devotional training for future clergy, as in Locke, than paying for a new playground surface on church property, as in Trinity Lutheran. Specified repairs to the church building itself admittedly fall somewhere between these two poles. In making their case, plaintiffs must persuade the court either that the Compelled Support Clause categorically precludes the use of public funds to pay for any repairs to a building that serves as a place of worship, without regard to the breadth and neutrality of the program pursuant to which the funding is provided, or that the specific repairs funded under this grant are prohibited. The first proposition is legally questionable; the second is not supported by the record.

¶ 31. Regarding the legal proposition, we are heavily influenced by the reasoning of the United States Court of Appeals for the Sixth Circuit in the case of American Atheists, Inc. v. City of Detroit Downtown Development Authority, 567 F.3d 278 (6th Cir. 2009). In that case, the City of Detroit, in preparation for hosting a Super Bowl, created a program to refurbish the exteriors of downtown buildings and parking lots in a discrete section of downtown Detroit. The program applied to all property within the defined area, and paid up to 50% of the refurbishing costs. The grants were directed to permanent physical improvements to building facades generally visible from a public right of way, or certain enumerated improvements to the street-side edges of parking

grantee is otherwise on notice of this constraint. Accordingly, we do not rely on this asserted constraint in ascertaining the uses to which the UCC may put the grant funds.

15

lots.  Three churches within the designated district participated, and collectively received 6.4% of the $11.5 million allocated for completed and authorized projects.  The question before the court was whether payments to the three churches pursuant to this program violated the Establishment Clause of the U.S. Constitution or the counterpart provision in the Michigan Constitution.  See Mich. Const. art. I, § 4 ("No person shall be compelled . . . to contribute to the erection or support of any place of religious worship . . . .").

¶ 32.    The Sixth Circuit emphasized several factors in concluding that the challenged grants were permissible.  Detroit's "program allocate[d] benefits in an evenhanded manner to a broad and diverse universe of beneficiaries."  Am. Atheists, Inc., 567 F.3d at 289.  The program assessed a recipient's eligibility for benefits "in spite of, rather than because of, its religious character," id. and "mak[d] grants available to a wide spectrum of religious, nonreligious and areligious groups."  Id. at 290.  Nothing in the history or implementation of the program revealed any "overt or masked" purpose to advantage religious groups.  Id.  Rather, it was designed for the religion-neutral purpose of revitalizing a section of downtown Detroit.  Id.  Although the funds were used to upgrade some buildings in which religious worship took place, they were available to religious and secular entities alike based on criteria that have nothing to do with religion.  Id. The vast majority of the upgrades at issue—renovation of exterior lights, pieces of masonry and brickwork, outdoor planters, trim and gutters, for example, lacked "any content at all, much less a religious content."  Id. at 292.

¶ 33.    The court also identified other contexts in which public support that helps religious organizations is constitutionally permissible.  It noted that a city may extend sewers and sidewalks to churches, synagogues and mosques, may provide police and fire-protection services to them, and may afford them property-tax exemptions available to charitable organizations.  Id. at 291. The court noted, "[i]f a city may save the exterior of a church from a fire, it is hard to understand

16

why it cannot help save the same church with peeling paint or tuckpointing—at least when it provides the same benefit to all downtown buildings on the same terms." Id. at 292.

¶ 34. Finally, the court noted that a categorical no-aid rule to religious entities would mean that the government could not preserve the Ebenezer Baptist Church in Atlanta or the Old North Church in Boston, "both of which benefit from direct federal aid under the 'Save America's Treasures' program." Id. at 299. Likewise, one-time emergency assistance through FEMA and other public agencies would be unavailable to churches devastated by natural disasters. Id.

¶ 35. Although the American Atheists court analyzed the issue pursuant to the Establishment Clause of the First Amendment, many of its insights apply with respect to the Compelled Support Clause. Where funding is available on a neutral and non-discriminatory basis to a broad and diverse group of potential recipients in order to promote a squarely secular goal of the broader community, there is no indication that the funds are intended to or do advantage religious organizations or activity, and the funds are used for structural repairs rather than, for example, erecting religious symbols, we cannot conclude that such funds support worship within the meaning of Article Three. To the extent that plaintiffs rely on the broad claim that spending any public money on repairs to any part of the UCC church building violates the Compelled Support Clause, they will face an uphill battle on the merits.

¶ 36. Plaintiffs' alternate path to success on the merits—establishing that this particular grant violates the Compelled Support Clause—is not well supported by the record as it currently exists. The CIFC grant funds are available to community groups, non-profits, civic organizations, fraternal organizations, and similarly situated groups in the Town, as well as to committees or other entities created by the Town, Village of Cabot, or the Cabot School District. By all appearances, the grant program is available to a broad and diverse collection of potential grantees that is defined without reference to religious affiliation. Moreover, the criteria for awarding the grants have nothing to do with religious worship. The grants are designed to, among other things,

17

enhance the quality of life and the character of the town, promote commercial development consistent with the scale and character of the community, promote education, and improve community infrastructure, facilities, and services. The applicable guidelines list a host of strategies for accomplishing these general goals. Plaintiffs may be able to establish that the grant program is not as neutral and broad-reaching as it appears, that the criteria for awarding the grants are so broad and vague that they cannot be described as neutral in the American Atheists sense, or that as designed or implemented it advantages the UCC as a religious organization; they have not done so on this record.

¶ 37.    Likewise, plaintiffs may be able to establish that the award of the grant monies in this case crosses a line by funding religious worship. In their brief, they suggest that the approval by Town voters pursuant to the warned question is broad enough to allow the expenditure of public funds "on anything at all that needs repair, including purely religious parts of the building or religious artifacts." However, on this record the grant is limited to two particular purposes— painting three sides of the exterior of the church building and examining the window sills in the church. The cost of these two projects is only a small fraction of the overall cost of the renovation project, and the public funding will accordingly amount to only a small fraction of the overall cost of the UCC's broader renovation. On this record, plaintiffs have not shown that the grant funds may be used to repair religious artifacts or other parts of the building that may more squarely run into the limitations of Article Three. Cf. Locke, 540 U.S. at 722 (stating, with respect to public funding for the training of church leaders, "we can think of few areas in which a State's antiestablishment interests come more into play").

¶ 38.    For the above reasons, we conclude on the basis of the current record that the plaintiffs' likelihood of success on the merits weighs against the issuance of a preliminary injunction.

18

B. Irreparable Injury to Movant

¶ 39.   Although our analysis of the merits likely resolves the preliminary injunction appeal, we also conclude that the plaintiffs would not suffer an irreparable injury in the absence of a preliminary injunction. The gravamen of plaintiffs' complaint is that municipal funds have been misappropriated for unconstitutional purposes—an injury that could be remedied by repayment of the funds to the Town in the event that plaintiffs prevail. The claims in this case are narrow and distinguishable from the cases relied upon by the trial court to support its analysis of the irreparable injury factor.

¶ 40.   A preliminary injunction will usually be denied "if the applicant has an adequate alternate remedy in the form of money damages or other relief." Wright & Miller, Federal Practice & Procedure, § 2948.1 (3d ed. 2017). In this case, the injury at the root of plaintiffs' claim is the use of municipal funds to support a place of worship in violation of the dictates of their respective consciences. If they prevail, the UCC will be ordered to repay the money, and the violation will be remedied. There is no evidence that the UCC would be unable to repay the $10,000 grant if plaintiffs prevail.

¶ 41.   We recognize that in most cases, the violation of a plaintiff's constitutional rights is itself a sufficient irreparable injury to support a preliminary injunction. Generally, "[w]hen an alleged deprivation of a constitutional right is involved, such as the right to free speech or freedom of religion, most courts hold that no further showing of irreparable injury is necessary." Id. The decisions relied upon by the trial court in its irreparable injury analysis affirm this principle. However, almost all of those cases involve a deprivation of liberty or constitutional freedom that cannot be "undone" through the payment of money. See, e.g., Elrod v. Burns, 427 U.S. 347, 373 (1976) (deprivation of First Amendment freedoms of public employees threatened with discharge based on political affiliations amounts to irreparable injury); Jolly v. Coughlin, 76 F.3d 468, 482 (2d Cir. 1996) (cruel and unusual punishment under the Eighth Amendment and denial of the right

19

to free exercise of religious beliefs are harms that cannot be adequately compensated monetarily); Tolbert v. Koenigsmann, No. 9:13-cv-1577 (LEK/DEP), 2016 WL 3349317, *4 (N.D.N.Y. June 15, 2016) (Eighth Amendment claim sufficiently invoked the presumption of irreparable harm); Bloom v. O'Brien, 841 F. Supp. 277, 278-79 (D. Minn. 1993) (where exercising a First Amendment right will subject a plaintiff to criminal penalties, the threat of irreparable harm is established). Libin v. Town of Greenwich, 625 F. Supp. 393, 400 (D. Conn. 1985) (violation of plaintiffs' First Amendment rights through display of cross on town property constituted an irreparable injury).

¶ 42.    We conclude that this principle does not apply in this narrow class of cases in which the plaintiffs' injury consists of an allocation of public funds that can be repaid.  The injury here is not that plaintiffs are confronted with a fresh coat of paint on the UCC church building that violates their conscience; it is the notion that public monies were used to pay for that paint.  In contrast to the imposition of cruel and unusual punishment, or the denial of the right of free speech, this is an alleged constitutional violation that can be "undone" through repayment of the challenged grant monies back to the Town.  But see Annunziato v. New Haven Bd. Of Aldermen, 555 F. Supp. 427, 432 (D. Conn. 1982) ("Although the basis of plaintiffs' standing to sue is their alleged economic injury, monetary damages would be inadequate compensation for the additional legal injury from the underlying violation of the Establishment Clause.").

¶ 43.    For the above reasons, we affirm the trial court's denial of the Town's motion to dismiss on standing grounds, and vacate the preliminary injunction in this case.

Affirmed in part, vacated in part, and remanded for further proceedings.

FOR THE COURT:

_____

Associate Justice