VERMONT SUPERIOR COURT
Windsor Unit
12 The Green
Woodstock VT  05091
802-457-2121
www.vermontjudiciary.org

CIVIL DIVISION
Case No. 24-CV-00846



David Allen and Kristey Allen
     Plaintiffs

v.

Feeney Property Maintenance LLC
and Roni Johnson DBA Roni Johnson Landscaping
     Defendants

<u>Decision on Plaintiffs' Motion for Preliminary Injunction</u>
<u>Decision on Defendant Roni Johnson's Motion for Writ of Attachment</u>

Plaintiffs David Allen and Kristey Allen own land in Barnard, Vermont. During the fall of 2022, in anticipation of building a residence on the property, they hired defendant Feeney Property Maintenance LLC to perform excavation work and prepare the site on a time-and-materials basis. Defendant Feeney Property Maintenance, in turn, subcontracted with defendant Roni Johnson to perform at least some of the work. A disagreement eventually arose between plaintiffs and defendants, and plaintiffs refused to pay several periodic invoices that had been submitted by defendants. Both defendants thereafter asserted liens against the property for amounts due.

Plaintiffs filed the present civil action and requested a preliminary injunction discharging both liens. Both defendants answered the complaint and filed counterclaims for amounts due. Both defendants also filed motions to enforce their mechanics' liens, although defendant Feeney Property Maintenance LLC subsequently withdrew its request. An evidentiary hearing was held on defendant Johnson's motion for enforcement of the lien, along with plaintiffs' motion for a preliminary injunction. Evidence was presented on May 17, 2024 and June 21, 2024. Plaintiffs appeared and represented themselves, and defendants appeared and were represented by Atty. Windish. The following factual findings were established by a preponderance of the credible evidence.

Paul Feeney is the principal of defendant Feeney Property Maintenance LLC. Plaintiffs knew Mr. Feeney from the community and had worked with him in the past. In November 2022, they approached him about performing excavation and site-preparation work at the property, including land clearing, stump removal, foundation preparation, driveway construction, an underground electrical conduit, and a septic system. Mr. Feeney provided a verbal estimate of the amount of money and time it would take to complete the work on a time-and-materials basis, and plaintiffs asked him to begin work. Before Mr. Feeney began working on the property, however, plaintiffs changed the location of their house site. Although the change had material consequences for the scope of work, the parties did not discuss whether the change would affect the estimate.

Mr. Feeney dug some test pits during the spring of 2023, but did not begin work in earnest until the summer, on account of difficult weather and some prior commitments. Mr. Feeney hired Mr. Johnson as a subcontractor to assist with the work, because they had worked together in the past, and because Mr. Johnson had access to large excavation equipment. Defendants began working on the site, and Mr. Feeney submitted period invoices to plaintiffs, which they paid. After at least some work had begun, however, plaintiffs changed the location of the housesite again, moving the house further up the hill. Although the change did not appear dramatic on an overhead map, there was a substantial grade involved, and the change had material consequences from a site-preparation perspective. Defendants had to clear more trees, dig more stumps, adjust the location of the driveway, and adjust the location of the leach filed. The parties did not discuss whether the location change would affect the estimate.

By the fall of 2023, plaintiffs felt that the project was proceeding slowly. Plaintiffs also felt that the project was becoming costly, as the amount paid began to approach the amount of the verbal estimate, even though the work was only partly completed. During a conversation in October 2023, Mr. Feeney told plaintiffs that the overall cost would exceed the verbal estimate.

At some point during the fall of 2023, plaintiffs attempted to expedite the work by approaching Mr. Johnson directly and asking him to take over the project. He declined, but during the ensuing conversations, plaintiffs arranged for Mr. Johnson to submit his invoices directly to them for payment. After receiving those invoices, plaintiffs began scrutinizing them and comparing them to the invoices submitted by Mr. Feeney, and further comparing them to their own notes and observations. Plaintiffs became convinced that the invoices contained substantial errors and overcharges. Plaintiffs confronted both defendants during a meeting at the Barnard General Store in January 2024. After that meeting, plaintiffs remained unsatisfied, and refused to pay several invoices submitted by both defendants.

Mr. Johnson's invoices became a central issue. They contain only a few lines of information: typically, there is a line identifying the number of hours spent on labor, at a rate of $50 per hour, and a few additional lines of information identifying the number of hours spent on a few different types of heavy equipment, ranging from $75 per hour for a dump truck to $120 per hour for a large excavator. Plaintiffs' contention is that the number of hours on the invoices are inaccurate.

Mr. Johnson's invoices are complicated, however, in that the number of hours indicated on the invoices does not reflect the number of hours actually spent performing each task, but rather include a series of calculations and adjustments meant to capture the cost of running the equipment and his profit margin. Mr. Johnson explained these calculations during the evidentiary hearing, and the court was persuaded by his explanation. Essentially, he owns the excavation equipment, and charges different rates for the use of the equipment depending upon whether is operating the equipment or someone else is operating the equipment. If he is operating the equipment, he charges for the use of the machine plus his own time. If someone else is operating the equipment, charges only for the use of the machine. Either way, he also charges a markup, for profit.

For example, for the use of the large excavator, Mr. Johnson charges $120 per hour if he is the one using the machine, and he charges $90 per hour if someone else is using the excavator. One period of time reflected by the evidence involved Mr. Johnson using the excavator for 0.9 hours, and someone else using the excavator for 19 hours. For this period of time, the use of the excavator was billed 0.9 hours at $120 per hour and 19 hours at $90 per hour, plus a 10% markup for profit, which totals about $2,000.

Mr. Johnson reflects this information on his invoices, however, by making adjustments to the number of hours, instead of including multiple lines of information. In other words, using the numbers from the above example, he charged $120 per hour for the use of the excavator regardless of who was using the equipment, and accounted for his own time in full, but discounted by 25% the number of hours in which the equipment was used by another operator. He therefore calculated the number of hours as 0.9 plus 14.3 (which is 19 hours * 75%, rounded up), and then multiplied that sum by 1.1 in order to account for his profit markup. Mr. Johnson's actual invoice, therefore, shows 16.7 hours on the excavator at the rate of $120 per hour, which comes out nearly the same as the different method of calculation above (a few dollars' difference is attributable to rounding).

Mr. Feeney also billed plaintiffs for the time that he and his son spent working on the project. Mr. Feeney billed different rates for his time and for his son's time, and at least some of their time was spent operating Mr. Johnson's excavation equipment. In other words, Mr. Feeney also billed plaintiffs for the time that he and his son spent using the excavator equipment. It therefore appears as though there is double-billing occurring, but this is a misunderstanding and a misinterpretation. Mr. Johnson is billing for his time, the cost of running the equipment, and his profit markup. Mr. Feeney is billing for his time, his son's time, and his profit markup. All of these are separate items, appropriately billed to the client.

After plaintiffs refused to pay invoices, Mr. Johnson and Mr. Feeney both provided written notice to plaintiffs of mechanics' liens in the amount of the unpaid invoices. Mr. Johnson's lien was asserted in the amount of $29,520.80, and Mr. Feeney's lien was asserted in the amount of $14,746.00. Both defendants then filed a written memorandum of the mechanic's liens in the land records. Mr. Johnson has sought to perfect his lien, but Mr. Feeney has not.

At issue is whether (1) the court should issue a writ of attachment to Mr. Johnson or whether instead (2) the court should issue a preliminary injunction requiring Mr. Johnson and Mr. Feeney to discharge the written memoranda they filed with the town clerk. An analysis of these issues requires discussion of the mechanics' lien statute, the Vermont Prompt Payment Act, the procedures applicable to motions for writs of attachment, the standards applicable to contractual claims in construction cases, and the standards applicable to requests for preliminary injunctions. The court addresses each of those legal frameworks in turn.

1. Although the statutes regarding mechanics' liens have been amended from time to time, some version of the lien has existed in Vermont since at least 1849. *Newport Sand and Gravel Co. v. Miller Concrete Constr., Inc.*, 159 Vt. 66, 69 (1992); *In re Rainbow Trust*, 216 B.R. 77, 84 (2d Cir. 1997). The purpose of the lien is to permit contractors and subcontractors to "secure the payment" for their home-improvement work on real property. 9 V.S.A. § 1921(a); *Newport Sand and Gravel Co.*, 159 Vt. at 69. A contractor or subcontractor may claim the lien as of the time that work commences on the property by giving written notice of the lien to the property owner and by filing a written memorandum of the lien with the town clerk within a specified period of time. 9 V.S.A. §§ 1921(b) & 1923; *In re Cusson*, 412 B.R. 646, 654 (D. Vt. 2009); *In re Ahokas*, 361 B.R. 54, 60–61 (Bankr. D. Vt. 2007). A written memorandum filed in this manner places "the owner and the world" on notice "that the property stands charged with the payment of bills of the creditor," *In re APC Construction, Inc.*, 132 B.R. 690, 694 (D. Vt. 1991), and creates at least "a practical effect upon alienation" for the time being. *Filter Equipment Co., Inc. v. International Business Machines Corp.*, 142 Vt. 499, 502 (1983); *Wharton v. Tri-State Drilling & Boring*, 2003 VT 19, ¶ 9, 175 Vt. 494 (mem.).

Merely filing the written memorandum, however, is not sufficient to perfect the lien. A contractor must thereafter commence a civil action and obtain an attachment "[w]ithin 180 days from the time of filing such memorandum." 9 V.S.A. § 1924; *Filter Equipment Co.*, 142 Vt. at 501–02; *Cusson*, 412 B.R. at 654. An attachment must actually be obtained within that time; merely commencing the suit or filing a motion is not sufficient. *Filter Equipment Co.*, 142 Vt. at 502–03; *Cusson*, 412 B.R. at 654; *APC Constr.*, 132 B.R. at 694. If the attachment is not obtained within 180 days of the filing of the memorandum, the lien expires, and secures nothing. *Filter Equipment Co.*, 142 Vt. at 502–03; *Rainbow Trust*, 216 B.R. at 83; *Cusson*, 412 B.R. at 654; *APC Constr.*, 132 B.R. at 694.

2. Obtaining an attachment from a court is not an empty gesture. An attachment of real property is intended to be an "extraordinary remedy," and courts have acknowledged that attachments result in "substantial economic effects," including impairments of marketability. *Brastex Corp. v. Allen International, Inc.*, 702 F.2d 326, 332 (2d Cir. 1983); *Ruggieri-Lam v. Oliver Block LLC*, 120 F.Supp.3d 400, 405 (D. Vt. 2015); *Terranova v. AVCO Financial Services of Barre, Inc.*, 396 F.Supp. 1402, 1406–07 (D. Vt. 1975). For this reason (other than in limited circumstances not present here), orders of approval are issued only after notice and an opportunity for hearing, at which the moving party bears the burden of persuading the court that there is "a reasonable likelihood that the [movant] will recover judgment, including interests and costs, in an amount equal to or greater than the amount of the attachment over and above any liability insurance, bond, or other security shown by the [non-moving party] to be available to satisfy the judgment." Vt. R. Civ. P. 4.1(b)(2); *Ruggieri-Lam*, 120 F.Supp.3d at 405; *Troy Boiler Works, Inc. v. Long Falls Paperboard, LLC*, 2021 WL 8694355 at *7 (D. Vt. Aug. 13, 2021)

A finding of a "reasonable likelihood" of success on the merits is intended to be "a realistic conclusion by the court on the basis of affidavits and other evidence presented at the hearing as to the actual probability of recovery by the [movant]," and the court must consider any modifying evidence and affirmative defenses offered by the non-moving party. Vt. R. Civ. P. 4.1, Reporter's Notes—1973 Amendment; *Ruggieri-Lam*, 120 F.Supp.3d at 405–09; *Vermont Federal Credit Union v. Richter*, No. 2013-354, 2014 WL 3714629 (Vt. Feb. 2014) (unpub. mem.); *Wellford v. Eissmann*, No. 747-10-09 Wrcv, 2010 WL 2259084 (Vt. Super. Ct. Mar. 9, 2010) (Eaton, J.).

3. In construction cases, homeowners are typically obligated by the Vermont Prompt Payment Act to pay their contractor "strictly in accordance with the terms of the construction contract," and to pay periodic invoices that are submitted along the way. 9 V.S.A. § 4002(a)–(c); *The Electric Man, Inc. v. Charos*, 2006 VT 16, ¶ 8, 179 Vt. 351. If a dispute arises, a homeowner may withhold payment "in an amount equalling the value of any good faith claims against an invoicing contractor or subcontractor, including claims arising from unsatisfactory job progress, defective construction, [or] disputed work." 9 V.S.A. § 4007(a); *Trombly Plumbing & Heating v. Quinn*, 2011 VT 70, ¶¶ 9–11, 190 Vt. 552 (mem.). A court may thereafter review the claims and determine whether the withholding was appropriate, 9 V.S.A. § 4007(a); *Nadeau Lumber, Inc. v. Benoit*, 140 Vt. 298, 300–01 (1981), or erroneous but withheld in good faith, e.g., *Fletcher Hill, Inc. v. Crosbie*, 2005 VT 1, ¶ 8, 178 Vt. 77; *Birchwood Land Co., Inc. v. Ormond Bushey & Sons, Inc.*, 2013 VT 60, ¶ 29, 194 Vt. 478, or wrongful and unreasonable, e.g., 9 V.S.A. § 4007(b).

4. In this case, one of plaintiffs' central contentions has been that a contractor cannot file a mechanic's lien when the homeowner has withheld payment under the withholding provisions of the Prompt Payment Act. The court finds no support for the assertion, for several reasons. First, plaintiffs' argument is not consistent with the text and structure of the mechanics' lien statute, which permits liens to be asserted as soon as the work commences, in order to secure future payment. 9 V.S.A. § 1921(b); *Cusson*, 412 B.R. at 654. A mechanic's lien may be filed regardless of whether any payments are overdue or even due at all. As such, there does not appear to be a relationship between whether a mechanic's lien may be asserted and whether a homeowner has withheld payment under the PPA.

Second, the mechanics' lien was available in this state for at least 140 years before the Prompt Payment Act was enacted by the Legislature as part of Act 74 in 1991. It is true that the PPA contains a provision relating to homeowner withholding, but nothing about the PPA indicates an intention to disavow existing remedies. On the contrary, the purpose of the PPA was to expand the remedies available to contractors and subcontractors, and to provide contractors and subcontractors with additional protections against nonpayment. *Sweet v. St. Pierre*, 2018 VT 122, ¶ 17, 209 Vt. 1; *Electric Man*, 2006 VT 16, ¶ 12, 179 Vt. 351. It was in the context of those expanded remedies that the Legislature felt the need to clarify that "[n]othing in" the PPA displaced the existing common-law right of a homeowner to withhold payment as a setoff for defective work. 9 V.S.A. § 4007(a); *Benoit*, 140 Vt. at 300–01; *Battenkill Constr. Co., Inc. v. Haig's, Inc.*, 133 Vt. 503, 504–05 (1975).

Third, the due-process procedures available in attachment hearings provide homeowners with a forum in which to explain their reasons for withholding payments from their contractors and subcontractors. *Terranova*, 396 F.Supp. at 1406–07. Before granting an order of approval, the court hears from the contractor about why they believe they are entitled to an attachment, and from the homeowner about why they believe the contractor is not owed any more money, and the court makes the decision only after receiving evidence from both sides and determining whether the contractor has shown a "reasonable likelihood" that they will prevail on the merits of the case. Vt. R. Civ. P. 4.1, Reporter's Notes—1973 Amendment; *Ruggieri-Lam*, 120 F.Supp.3d at 405–09; *Richter*, No. 2013-354, 2014 WL 3714629; *Eissmann*, No. 747-10-09 Wrcv, 2010 WL 2259084; *The McKernon Group, Inc. v. Felten*, No. 737-10-08 Wrcv, 2009 WL 6356593 (Vt. Super. Ct. Jan. 16, 2009) (Eaton, J.). If the court decides that the contractor has established a "reasonable likelihood," then the order of approval issues, and the case proceeds to discovery and other phases of the litigation. A contractor must still eventually establish its claim on the merits and obtain a judgment—which is not a foregone conclusion, e.g., *Felten*, No. 737-10-08 Wrcv, 2009 WL 6356593—and record a certified copy in the land records. 9 V.S.A. § 1925; *Cusson*, 412 B.R. at 655. If the court decides that the contractor has not met this burden of proof, or that the work was defective and that no payment is due, then the order of approval does not issue, and the lien secures nothing. *Nadeau*, 140 Vt. at 300–01.

For these reasons, there is nothing procedurally unconstitutional or unfair about the assertion of a mechanic's lien in a case where the homeowner has withheld payments from a contractor or a subcontractor under the terms of the PPA. Adequate procedural mechanisms exist for the fair and timely adjudication of those disputes.

5. In construction disputes, the central determination is whether the contract has been breached. *VanVelsor v. Dzewaltowski*, 136 Vt. 103, 105 (1978); *Vermont Structural Steel Corp. v. Brickman*, 126 Vt. 520, 523–24 (1967); 5 Bruner & O'Connor on Construction Law § 18:1. A homeowner may prove that a contractor has breached the contract in one or more ways, including by failing to perform the contract in a timely manner, or by failing to perform services in a workmanlike manner. *South Burlington Sch. Dist. v. Calcagni-Frazier-Zajchowski Architects, Inc.*, 138 Vt. 33, 44 (1980); *Trask v. Granter*, 135 Vt. 465, 467 (1977); *Dzewaltowski*, 136 Vt. at 106; 5 Bruner & O'Connor, *supra*, at § 18:2. In some cases, the failure of a contractor to perform in a workmanlike manner is obvious to a layperson, and requires no expert testimony. In other cases, the alleged failure is more subtle or complicated, and requires testimony from someone familiar with industry standards to explain whether the work performed on this occasion was consistent with those standards or rather an unreasonable departure from them. *Quinn*, 2011 VT 70, ¶ 14, 190 Vt. 552.

In this case, the evidence presented did not establish any defective or untimely workmanship on the part of defendants. At issue here was a time-and-materials contract, and the only reference point was a verbal representation from Mr. Feeney as to the estimated amount of time and money it would take to complete the work. However, the scope and nature of the work changed twice after that estimate was given, and the evidence did not establish any other objective reference points as to how long the revised work should have taken, nor how much the revised work should have cost, e.g., *Trask*, 135 Vt. at 467. In other words, there was no credible or persuasive evidence presented to the court to establish whether the work performed by defendants took too long or cost too much. In the absence of that evidence, the court cannot find defective workmanship, nor conclude that any breach of contract thereby took place.

6. Plaintiffs also asserted that defendants destroyed a perennial garden, and that this was either defective workmanship or negligence. Here, the court found credible defendants' explanation that the incident was caused by plaintiffs' relocation of the house after the work had already started, which required adjustment of the location of the driveway and the location of the underground electrical conduit. It was the location of the conduit, in particular, that required plaintiffs to dig where they did and to operate the equipment where they did. Defendants also credibly testified that this was discussed with plaintiffs. A preliminary assessment of this issue based upon the evidence presented at the hearing does not support the conclusion that the resulting damage was either a breach of contract or negligence.

7. In a construction dispute, a contractor may prove that a homeowner breached a contract by failing to pay amounts due. *Dzewaltowski*, 136 Vt. at 105–06; *Cass-Warner Corp. v. Brickman*, 126 Vt. 329, 336 (1967). In this case, Mr. Johnson established a reasonable likelihood that he will prevail on the merits of his claim for payment in the amount of at least $29,520.80, which reflects his two unpaid invoices. As reflected above, the evidence presented at the attachment hearing established that Mr. Johnson's invoices reflected true and accurate billing for his time spent on the project, even though the invoices were based upon calculations that were not evident on the face of the documents themselves. It was the impression of the court that the disputes in this case reflected misunderstandings rather than misrepresentations. Mr. Johnson is entitled to an attachment in that amount.

8. A preliminary injunction is also "an extraordinary remedy" that requires a court to balance competing claims and to evaluate the significance of the threat of irreparable harm to the moving party, the degree of burden that would be imposed upon the non-moving party, the probability that the moving party will succeed on the merits of their claim, and the public interest. *Taylor v. Town of Cabot*, 2017 VT 92, ¶ 19, 205 Vt. 586; *State v. Glens Falls Ins. Co.*, 134 Vt. 443, 450 (1976). In this case, although plaintiffs have requested an injunction requiring both defendants to discharge their liens, the court does not find a probability that plaintiffs will succeed on the merits of their claims against either defendant, principally for the reason that plaintiffs' evidence did not establish whether the work performed by defendants took too long or cost too much. It may be that there are certain adjustments eventually made with respect to the invoices presented by defendant Feeney Property Maintenance, but the evidence did not support a finding that the amount of the adjustments would be material to the equitable question of whether the court should order defendant to discharge its lien. An additional consideration is that defendant Feeney Property Maintenance has not sought to perfect its lien, and the lien expires soon. Although a filed memorandum does represent some speculative detriment to the homeowner, *Filter Equipment Co.*, 142 Vt. at 502; *Wharton*, 2003 VT 19, ¶ 9, 175 Vt. 494, the evidence did not support a finding that an irreparable harm would occur between the time of the hearing and the time that the lien expires. See *Taylor*, 2017 VT 92, ¶ 40 (explaining that harms are not irreparable if they are compensable by the payment of money).

For these reasons, the court grants defendant Roni Johnson's motion for a writ of attachment (Motion 2), and issues a separate order of approval in the principal amount of $29,520.80, together with estimated prejudgment interest as of today's date in the amount of $1,241.45, for a total approved amount of $30,762.25. A writ of attachment will issue separately. Plaintiff's motion for a preliminary injunction (Motion 1) is denied.

Electronically signed on Tuesday, July 16, 2024 pursuant to V.R.E.F. 9(d).

H. Dickson Corbett
Superior Court Judge

Vermont Superior Court
Filed 07/16/24
Windsor Unit